**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **MADISON CONSTRUCTION GROUP, INC.,** | ) Case No. 16-32006 |
| | ) |
| Debtor. | ) |

**DISCLOSURE STATEMENT RELATING TO
PLAN OF REORGANIZATION OF MADISON CONSTRUCTION GROUP, INC.**

Madison Construction Group, Inc. hereby submits this "Disclosure Statement Relating to Plan of Reorganization of Madison Construction Group, Inc." pursuant to section 1125 under Title 11 of the United States Code, 11 U.S.C. § 101 et seq.

**ARTICLE I
INTRODUCTION AND DISCLAIMERS**

**No representations concerning the debtor, its business, or future operations, other than those specifically set forth herein, have been authorized by the debtor.**

A.   **GENERAL**

On December 15, 2016 (the "Petition Date")[1], Madison Construction Group, Inc., a North Carolina corporation (the "Debtor," or "Madison"), filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). The Debtor continues in possession of its properties and the management of its business as a "debtor-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Contemporaneously herewith, the Debtor has filed its "Plan of Reorganization of Madison Construction Group, Inc." (the "Plan"). The Plan sets forth the proposed reorganization of the Debtor's chapter 11 estate (the "Estate") and the distribution of payments to creditors (collectively, the "Creditors") of the Estate. A copy of the Plan is attached as <u>Exhibit A</u> to this disclosure statement (the "Disclosure Statement") and incorporated herein by reference.

The Debtor is soliciting acceptances of the Plan from the classes of Claims entitled to vote on the Plan. This Disclosure Statement is submitted pursuant to § 1125 of the

---

[1] Capitalized terms used in this Disclosure Statement, if not defined herein, are to be read consistently with the definitions provided in Article I of the Plan, as defined herein.

{00389149.DOCX V. M527.024195;}

Bankruptcy Code in order to provide information of the kind necessary to enable a hypothetical reasonable investor to make an informed judgment in the exercise of its right to vote on the Plan.

The Honorable J. Craig Whitley, United States Bankruptcy Judge, has presided over this chapter 11 case (the "Chapter 11 Case") since its inception. An official committee of unsecured creditors was not appointed in the Chapter 11 Case due to a lack of interest. Neither a chapter 11 trustee nor an examiner has been appointed in the Chapter 11 Case.

### B.     PURPOSE OF DISCLOSURE STATEMENT

The Debtor provides this Disclosure Statement in order to permit eligible parties to make an informed decision in voting to accept or reject the Plan.

This Disclosure Statement is presented to all Creditors in order to satisfy the requirements of § 1125 of the Bankruptcy Code. Section 1125 requires a disclosure statement to provide information sufficient to enable a hypothetical and reasonable investor, typical of the Creditors, to make an informed judgment whether to accept or reject the Plan. This Disclosure Statement may not be relied upon for any purpose other than that described above. **This disclosure statement and the plan are an integral package, and they must be considered together for the reader to be adequately informed.** The disclosure statement contains only a summary of the plan. Each creditor who is entitled to vote on the plan is urged to review the plan prior to casting its vote.

No representations concerning the debtor (particularly as to the value of its property) are authorized by the debtor other than as set forth in this disclosure statement. Any representations or inducements made to secure your acceptance of the plan other than as contained in this disclosure statement should not be relied upon by you in arriving at your decision, and such additional representations and inducements should be reported to counsel for the Debtor, who may in turn deliver such information to the Bankruptcy Court for such action as may be appropriate.

Although an effort has been made to be as accurate as possible under the circumstances, the debtor does not warrant or represent that the information contained in this Disclosure Statement is correct. The information contained in this Disclosure Statement, including the information contained in the exhibits attached hereto, has not been subject to an audit or independent review. Accordingly, the Debtor is unable to warrant or represent that the information concerning the Debtor or its financial condition is accurate or complete. Any projected information contained in this Disclosure Statement has been presented for illustrative purposes only, and because of the uncertainty and risk factors involved, the Debtor's actual results may not be as projected herein.

The statements contained in this Disclosure Statement are made as of the date of the Disclosure Statement unless another time is specified. The delivery of this Disclosure

Statement shall not under any circumstances create an implication that there has not been any change in the facts set forth since the date of the Disclosure Statement. Schedules of the assets and liabilities of the Debtor as of the Petition Date (collectively, as may be amended from time to time, the "Schedules") are on file with the Clerk of the Bankruptcy Court and may be inspected by interested parties during regular business hours.

**This Disclosure Statement has been prepared in accordance with § 1125 of the Bankruptcy Code and not in accordance with federal or state securities law or other applicable non-bankruptcy law.** Entities holding or trading in or otherwise purchasing, selling, or transferring claims against, interests in, or securities of the Debtor should evaluate this Disclosure Statement only in light of the purpose for which it was prepared. This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission nor has the Securities Exchange Commission passed upon the accuracy or adequacy of the statements contained herein.

The Honorable J. Craig Whitley will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") in the United States Bankruptcy Court, Charles Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina on _____ at _____ a.m. / p.m. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code, including whether the Plan is in the best interests of the Creditors, and will review the ballot reports concerning votes cast for acceptance and rejection of the Plan.

## ARTICLE II
## BACKGROUND INFORMATION REGARDING THE DEBTOR

**A.    DESCRIPTION OF THE DEBTOR**

The Debtor is a North Carolina corporation, created on February 5, 2004. Christopher Mezzanotte and Bonnie Benedum were the shareholders of the Debtor as of the Petition Date. The Debtor is managed by Christopher Mezzanotte as president of the company.

The Debtor has its principal place of business at 520 Eagleton Downs Dr Ste A Pineville, North Carolina. The Debtor has been a full-service subcontractor that offers turnkey packages for carpentry, millwork, doors, hardware, and specialty installations. The Debtor's operations are based in Pineville, with projects in several states. As more fully listed in the bankruptcy schedules in this Chapter 11 Case, the Debtor's primary tangible assets consist of equipment, office furniture, and automobiles used in the operation of its business. The Debtor's operating revenue represents substantially all of the income the Debtor has ever received.

**B.    HISTORY**

The Debtor is a full-service subcontractor that has offered turnkey packages for

carpentry, millwork, doors, hardware, and specialty installations. The Debtor's operations are based in Charlotte, with projects in several states. Prior to the Petition Date, the Debtor became party to several lawsuits, which resulted in significant time and other burdens on the Debtor's management, defense costs to the Debtor, and exceedingly high insurance premiums for the Debtor. As a result of its high pre-petition insurance premiums, the Debtor's cash flow was limited in the months prior to the Petition Date, resulting in unpaid receivables to its primary subcontractors and suppliers. The preceding factors were the predominate cause for the Debtor filing the Bankruptcy Case.

### C.    COMMENCEMENT OF THE CHAPTER 11 CASE

On December 15, 2016, the Debtor filed a voluntary petition commencing this Chapter 11 Case. The Debtor filed this proceeding in order to reorganize its business so that it could continue to operate and maximize funds to pay the pre-petition claims of its creditors. An official committee of unsecured creditors was not appointed in this Chapter 11 Case due to a lack of interest. Neither a trustee nor an examiner has been appointed in the Chapter 11 Case.

### D.    OPERATION DURING THE CHAPTER 11 CASE

The Debtor has continued to manage its business and affairs as debtor in possession, subject to the oversight of the Bankruptcy Administrator and the Bankruptcy Court. The Debtor has substantially complied with all guidelines and regulations governing the operation of a business as the Debtor in possession. Consequently, certain actions of the Debtor during the pendency of the Chapter 11 Case, including all transactions outside of the ordinary course of business, if any, were taken only after first requesting and receiving authorization from the Bankruptcy Court. Further, the Debtor is current on all reporting requirements and fees owed to the Court under the Operating Order entered in this case.

Upon the filing of the chapter 11 petition, substantially all claims against the Debtor that existed prior to the Petition Dates became subject to the automatic stay provisions under § 362 of the Bankruptcy Code while the Debtor continued operation of its business and affairs as a debtor in possession. These pre-petition claims may arise from the determination by the Bankruptcy Court of allowed claims for contingent liabilities and other disputed amounts.

Pursuant to the cash collateral Orders entered at Docket Nos. 3, 35, 73, 76, and 82, the Debtor has continued its day-to-day operations during the Chapter 11 Case. The Debtor continues to operate under the management of Christopher Mezzanotte, the President of the Debtor.

# ARTICLE III
# ASSETS AND LIABILITIES

A. **ASSETS**

   1. **Property**

   The Debtor's tangible assets consist primarily of automobiles, light commercial equipment, and office furniture located at 520-A Eagleton Downs Drive, Suite A, North Carolina. The Debtor has researched the valuation of its tangible assets through reference to Bluebook and to comparable sales. The Debtor values its tangible assets in the total amount of $392,776.00. The Debtor's primary asset is its accounts receivable. As more fully stated in the Schedules, the Debtor estimated the amount of its accounts receivable as $1,286,487.77 as of the Petition Date. A portion of the pre-petition accounts receivable has been collected throughout the course of the Chapter 11 Case and has been used in accordance with the approved Cash Collateral Orders and budgets in this case. The Debtor predicts that, in the event of a forced liquidation, the counterparties owing the remaining accounts receivable would assert defaults, preventing collection of the amounts due.

   2. **Causes of Action**

   The Debtor specifically reserves its right to pursue litigation and/or avoidance actions following confirmation of the Plan. The Plan reserves all right and title in any litigation claims to the estate and contemplates that all such causes of action will become property of the Purchaser upon Plan Confirmation. As of the date hereof, the Debtor estimates no recovery for pursuit of these causes of action. In the event that the Purchaser receives additional information, which positively impacts the estimated value of pursuing any cause of action, any net recovery on any claim would be applied to assist the Purchaser in meeting its assumed obligations under the Plan.

B. **CLAIMS AGAINST ESTATE**

   1. **Classification and treatment**

   The Plan divides the Claims against the Debtor into various Classes and designations and provides for the treatment of similarly situated creditors in a fair and equitable manner. Below is a description of the general Classes and designations of claims against the Debtor and the corresponding treatment thereof under the Plan. **Creditors are urged to review the Plan itself for the full treatment of the class to which they belong**. All amounts listed for each class of Claim are merely estimates, subject to change through the Debtor's claims review and objection process.

       a. <u>Class 1</u>. Class 1 consists of all Allowed Non-Tax Priority Claims. Such claims will be paid in full from Sale Proceeds on the Effective Date.

The Debtor scheduled certain Non-Tax Priority Claims held by employees as of the Petition Date. Pursuant to Court Order [Doc. 36], the Debtor issued payment on the payroll claims. The Debtor is not aware of any unpaid Non-Tax Priority Claims and therefore anticipates making no payments to this Class.

**b.**   <u>Class 2</u>.   Class 2 consists of all Allowed Secured Tax Claims. Such claimants will be paid in full from Sale Proceeds on the Effective Date. The Debtor estimates that the claims of this class total approximately $35,000.00.

**c.**   <u>Class 3</u>.   Class 3 consists of Yadkin Bank's Secured Claim. The Claim of Yadkin Bank will be treated as fully secured in the amount of $236,861.11 and paid according to the terms set forth in the Plan. The monthly payment to Yadkin Bank is estimated to be $4,469.86.

**d**.   <u>Class 4</u>.   Class 4 consists of the Ford Motor Credit's Secured Claims. The Ford Motor Credit Claims will be treated as fully secured in the amount of $115,459.11 and paid according to the terms set forth in the Plan. The monthly payment to Ford Motor Credit is estimated to be $2,747.54.

**e**.   <u>Class 5</u>.   Class 5 consists of Advantage Machinery's Secured Claim. Advantage Machinery will be permitted to foreclose upon its asserted liens upon the Effective Date.

**f**.   <u>Class 6</u>.   Class 6 consists of Carter Lumber's Secured Claim. The Debtor estimates the current outstanding balance of the Carter Lumber Secured Claim at $500,000. The Carter Lumber Secured Claim will be secured following the Effective Date by a secondary lien on the Sale Assets. Carter Lumber will receive payments from the Purchaser in equal monthly installments on or before the last day of each month beginning on the Effective Date and continuing through December 31, 2019. Assuming that the Effective Date occurs on March 1, 2018 as estimated in the Plan, the monthly payment to Carter Lumber will be $62,500.00

**g**.   <u>Class 7</u>.   Class 7 consists of all Allowed General Unsecured Claims. Such claims will receive payments, if available from the Sale Proceeds following payment to the preceding classes and the claims described in Paragraph 2, below. No distribution is anticipated to holders of Allowed General Unsecured Claim.

2.   **Administrative Expenses and Priority Tax Claims**
Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote to accept or reject the Plan. Claims in this category incurred

prior to the Confirmation Date shall be paid in full on the Effective Date, or as otherwise agreed by the holder.

      **a.**    <u>Estimated Amount of Administrative Expenses</u>.  To date, the aggregate unpaid legal fees incurred in this case total approximately $120,000.00, which are likely to increase before the Effective Date of the Plan.  The Debtor estimates quarterly fees due in the approximate amount of $10,500.00, for a total anticipated administrative expense of $130,500.00.  This figure does not include any claims of entities doing business in the ordinary course with the Debtor in possession during the pendency of the Bankruptcy Case.  Certain parties have indicated to the Debtor that such administrative claims exist. The Debtor estimates that at least $15,000 will be due upon the Effective Date in connection with post-petition claims.

      **b.**    <u>Estimated Amount of Priority Tax Claims</u>.  The aggregate priority tax claims scheduled and/or filed in this case total approximately $68,000.00.

      **c.**    <u>Bar Date</u>.  For all administrative claims incurred before the Confirmation Date, the appropriate legal documentation, be that proof of claim, motion or otherwise, must be initiated by filing and service on the Purchaser, and the Bankruptcy Administrator no later than thirty (30) days after the Effective Date.

**3.**    **Equity Interests**

The holders of Membership Interests in the Debtor shall retain no ownership interests in the Debtor.  All Membership Interests shall vest in Carolinas Millwork Group, Inc.

**4.**    **Objections**

The Debtor and/or Purchaser will pursue Objections to Claims, which shall be filed within one hundred and twenty (120) days of the Effective Date, or as otherwise extended by the Court.  Notice will be given to the holder of any claim to which an objection is filed.  All proposed settlements of Disputed Claims shall be subject to the approval of the Bankruptcy Court after notice and opportunity for a hearing (as such phrase is used in § 102(1) of the Bankruptcy Code).

**5.**    **Claims Bar Date**

The Bankruptcy Court established April 18, 2017 (the "Claims Bar Date") as the deadline by which all proofs of Claim must be filed in this Chapter 11 Case.  It is believed that the Bankruptcy Administrator and/or the Debtor transmitted notices of the Claims Bar Date to all known actual or potential claimants and informed them of their need to file a proof of Claim with the Bankruptcy Court on or before the Claims Bar Date.  The Court may establish additional notice procedures and/or deadlines in connection with the Claims Bar Date.

# ARTICLE IV
# PLAN SUMMARY AND EXECUTION

A. **PROPOSED REORGANIZATION AND SUMMARY**

The Debtor plans to sell its assets to Carolinas Millwork Group, Inc. for the purchase amount of $250,000.00 and the Purchaser's agreement to assume certain of the Debtor's liabilities, as more fully set forth in the Plan. In key part, the Purchaser will assume and honor the Debtor's secured liabilities to Yadkin Bank, Ford Motor Credit, and Carter Lumber.

Secured creditors shall retain their liens in the same priority and extent as they existed as of the Petition Date. The Debtor believes the Plan is in the best interest of all parties in interest and creditors of the estate.

The Debtor has reserved the right to resort to the "cram down" provisions of Section 1129(b) of the Bankruptcy Code.

B. **FEASIBILITY**

The Debtor is in possession of confirmed funding commitments from Carolinas Millwork Group. To the extent that anticipated, necessary distributions due on the Effective Date do not exceed $250,000, all such payments shall be issued from immediately available funds. Purchaser shall coordinate with Yadkin Bank, Ford Motor Credit, and Carter Lumber to give such proof of ability to pay the described debt amounts as required by those entities.

Disbursements will be made consistent with the terms of the Plan and in the aggregate will allow all creditors to receive more than they otherwise would under a chapter 7 liquidation scenario. More information on this topic is proved in Article V below. Claimants will receive cash payments on account of their claims and receive interest on those claims in accordance with the treatment of each class as set forth in the Plan. The schedule for payments is dictated by the Plan, but the Purchaser may elect to pay claims earlier than required, without penalty, to avoid the expense of any unmatured interest.

C. **ONGOING MANAGEMENT**

It is anticipated that the Purchaser will operate in much the same way as Madison Construction Group has during the course of this Chapter 11 Case. The Debtor forecasts that Christopher Mezzanotte will continue as the primary manager of operations following confirmation of the Plan. The Debtor reserves the right, however, of the Purchaser to employ whatever management strategies it feels best under the circumstances going forward.

Upon substantial consummation of the case, as that term is defined by bankruptcy law, the Debtor will seek entry of a Final Decree and closing of the Bankruptcy Case. The Purchaser will be free to manage its property and business affairs as it sees fit and the Plan will constitute its only obligation on account of any claim or liability which arose prior to Confirmation.

## ARTICLE V
## LIQUIDATION ANALYSIS

Notwithstanding acceptance of the Plan in accordance with section 1126 of the Bankruptcy Code, the Court must find that each member of an impaired class of creditors, if any, has each accepted the Plan, or will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount such creditor or interest holder would have received or retained if the Estate was liquidated under Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan complies with this "best interests" test.

As discussed below, a conversion of the Chapter 11 Case to a case administered under Chapter 7 of the Bankruptcy Code, followed by liquidation under Chapter 7, would engender higher expenses and risks than the reorganization and sale contemplated by the Plan. When coupled with the inevitable delay caused by the appointment of a Chapter 7 trustee and the retention of the trustee's professionals, distribution to holders of Allowed Claims that would otherwise be made on the Effective Date of the Plan necessarily will be delayed for an indefinite period.

A conversion of the Chapter 11 Case to a case administered under Chapter 7 of the Bankruptcy Code would require the appointment of trustee(s) to conduct the liquidation of the Estate. Such a trustee would likely have limited historical experience or knowledge of the Chapter 11 Case or of the Debtor's records, assets, or former business. The fees charged by a Chapter 7 trustee(s) and any professionals hired by the Chapter 7 trustee(s) could impose additional administrative costs on the Estate that will not be incurred under the Plan and which will be paid ahead of Allowed Administrative, Priority Tax, Other Priority, and General Unsecured Claims.

As more fully shown on the Hypothetical Liquidation Analysis attached hereto as Exhibit B and incorporated herein by reference, the Debtor scheduled the value of its equipment and office furniture in the amount of $294,748.00 and the value of its automobiles in the amount of $98,028.00, which amounts it submits as the best estimates of the value. The Debtor's current cash holdings are *de minimis*. For purposes of this analysis, the Debtor assumes that it will hold a $15,000 cash balance as of the Effective Date. The Debtor anticipates that its current accounts receivable would be either (i) offset by counterclaims against the company if its operations ceased or (ii) claimed by its suppliers and subcontractors through a lien on funds for the relevant projects; however, in the interest of providing what could be the best case scenario for its creditors in a

liquidation, the Debtor estimates an optimistic recovery of 20% of its projected accounts receivable in the liquidation analysis.

If this case were converted to a Chapter 7 proceeding, the Debtor estimates that the Trustee fees and liquidation costs would result in fees to the estate in the approximate amount of $67,904.00. Following payment of the liquidation costs, the trustee would hold inadequate funds to satisfy the Debtor's secured creditors. *No* funds would be available to pay the Debtor's administrative claims, priority unsecured claims, or general unsecured claims.

Under the proposed Plan, all Secured Claimants are projected either to (i) receive payment in full or (ii) permission to exercise their secured interests. Administrative Claims are projected to be paid in full. Priority Claims are projected to be paid in full.

Thus, confirmation of the Plan is preferable to liquidating the case under Chapter 7 of the Bankruptcy Code because creditors will receive more under the Plan than they would receive in a Chapter 7 liquidation. Accordingly, for all the foregoing reasons, the Debtor believes that confirmation of the Plan is in the best interests of the Creditors and fully complies with the statutory requirements of the Bankruptcy Code.

## ARTICLE VI
## CONFIRMATION OF PLAN

A.  **VOTING**

Holders of Claims in Classes 3, 4, 5 and 6 may be or are impaired by the Plan and, as such, the Debtor is soliciting votes from holders of Allowed Claims in these classes as set forth in Article 4 of the Plan.

The Plan will be confirmed if it is accepted by the requisite majorities of each Class of Claims entitled to vote on the Plan and all other conditions to confirmation are met by the Debtor. However, the Debtor may seek to "cram down" the Plan pursuant to § 1129(b) of the Bankruptcy Code on any Class of claimants that vote to reject the Plan. The requisite majority for confirmation of the Plan by a particular Class without "cram down" is acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims that are actually voted.

1.  **Voting Procedures**

Before voting, you should read this Disclosure Statement and any exhibits, including the Plan and its exhibits, in their entirety. Ballots must be received by the respective parties no later than _____.

You may vote on the Plan by completing and mailing the enclosed Ballots to:

Hamilton Stephens Steele + Martin, PLLC
Attention: Melanie Johnson Raubach
525 N. Tryon Street, Suite 1400
Charlotte, North Carolina 282405

You should use the ballots sent to you with this Disclosure Statement to cast your votes for or against the Plan. You may NOT cast ballots or votes orally. In order for your ballot to be considered by the Bankruptcy Court, it must be received at the above address no later than the time designated in the notice accompanying this Disclosure Statement. **Any ballot executed by the holder of an Allowed Claim that does not indicate acceptance or rejection of the Plan shall be considered a vote to accept the Plan.**

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot with this Disclosure Statement, you may obtain a ballot by contacting:

Hamilton Stephens Steele + Martin, PLLC
Attention: Melanie Johnson Raubach
525 N. Tryon Street, Suite 1400
Charlotte, North Carolina 282405

Only holders of Allowed Claims in impaired Classes are entitled to vote on the Plan. In addition, the record date of all Claims against the Debtor for voting purposes shall be the date on which this Disclosure Statement is approved by the Bankruptcy Court. Persons holding Claims transferred after such date will not be permitted to vote on the Plan. Subject to the terms of the Plan, Claimants who do not vote are not counted as having voted either for or against the Plan. Pursuant to the provisions of Section 1126 of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

2.     **Effect of Not Voting**

**A Creditor's failure to vote on the Plan will not affect such Creditor's right to a Distribution under the Plan.** Whether or not a Claimant votes on the Plan, such Persons will be bound by the Plan, including the terms and treatment of Claims set forth therein, if the Plan is accepted by the requisite majorities of the Classes or is "crammed-down" and confirmed by the Bankruptcy Court. Allowance or disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for purposes of Distribution under the Plan.

The Debtor may dispute proofs of Claim that have been filed or that the

Debtor listed as disputed in its Schedules filed with the Bankruptcy Court. Persons whose Claims are disputed may vote on, or otherwise participate in, Distributions under the Plan <u>ONLY</u> to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. The Schedules, which list the Claims and whether such Claims are disputed, can be inspected at the Office of the Clerk of the United States Bankruptcy Court for the Western District of North Carolina, Charles Jonas Federal Building, 401 West Trade Street, Room 111, Charlotte, North Carolina.

### B. OBJECTIONS TO CONFIRMATION

Any objections to confirmation of the Plan must be filed with the Clerk of the Bankruptcy Court and served upon (a) Melanie Johnson Raubach, Hamilton Stephens Steele + Martin, PLLC, 525 N. Tryon Street, Suite 1400, Charlotte, North Carolina 28244; and (b) Office of the United States Bankruptcy Administrator, 402 West Trade Street, Charlotte, North Carolina 28202, in such a manner as will cause such objections to be filed with the Bankruptcy Court and received by the aforementioned parties **no later than _____**.

### C. CONFIRMATION HEARING

A hearing on confirmation of the Plan is scheduled before the Honorable J. Craig Whitley, United States Bankruptcy Judge, United States Bankruptcy Court for the Western District of North Carolina, Charles Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina, on _____ **at \_\_\_\_\_ a.m./ p.m.** Announcement of the adjournment or continuance of such hearing, if any, may be made in writing or in open court. No further written notice is required to be sent to claimants, interest holders, or other parties in interest.

## ARTICLE VII
## <u>MISCELLANEOUS</u>

### 1. <u>Consummation – Retention of Jurisdiction</u>

Consummation of the Plan consists of satisfaction of any and all conditions to the effectiveness of the Plan. Pursuant to Article 12 of the Plan, the Bankruptcy Court will continue to retain jurisdiction after Confirmation of the Plan to resolve all outstanding matters in the Chapter 11 Case and with respect to the fulfillment of the obligations of the Reorganized Debtor under the Plan.

### 2. <u>Discharge, Release and Exculpation</u>

The consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, discharge, release, and termination of all Claims of any nature whatsoever against the Estate, the Debtor, or party involved in the reorganization effort. You are encouraged to review the Plan in its entirety for a full discussion of the release and

discharge contained therein.

### 3. Conditions to Progress of the Plan

The Plan and the occurrence of certain events upon which it is predicated, including Confirmation and Effectiveness, are subject to certain conditions, including but not limited to entry of a Confirmation Order in a form and substance satisfactory to the Debtor and the provision of Article 10 of the Plan.

## ARTICLE VIII
## CONCLUSION

For the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives. The Debtor thus urges all Creditors entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received by _____.

[Signatures on following page]

Dated: Charlotte, North Carolina
January 2, 2018

Respectfully submitted,

HAMILTON STEPHENS
STEELE + MARTIN, PLLC

By: */s/ Melanie Johnson Raubach*
Melanie Johnson Raubach (Bar No. 41929)
mraubach@lawhssm.com
525 N. Tryon Street, Suite 1400
Charlotte, North Carolina 28205
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
*Counsel for the Debtor*